**MIDWEST EMERY FREIGHT SYSTEM, INC.**

v.

**UNITED STATES of America and Interstate Commerce Commission.**

**No. 61 C 558.**

United States District Court
N. D. Illinois, E. D.

Dec. 21, 1961.

———◆———

Charles W. Singer, Chicago, Ill., Charles F. Riddle, Washington, D. C., Todd, Dillon & Singer, Chicago, Ill., of counsel, for plaintiff.

Lee Loevinger, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., James P. O'Brien, U. S. Atty., Omaha, Neb., for defendant United States of America.

Robert W. Ginnane, General Counsel, Fritz R. Kahn, Atty., Interstate Commerce Commission, Washington, D. C., for defendant Interstate Commerce Commission.

Stephen Robinson, Des Moines, Iowa, for intervenor Nebraska-Eastern Express, Inc., Omaha, Neb.

Donald E. Cross, Washington, D. C., Earl Meisenbach, Chicago, Ill., Watkins & Rea, Washington, D. C., of counsel, for intervenors All States Freight, Inc., Cooper-Jarrett, Inc., Kramer Bros. Freight Lines, Inc., Spector Freight System, Inc., Wilson Freight Forwarding

Co., Middle Atlantic Conference, Central States Motor Freight Bureau, Inc., and New England Motor Rate Bureau, Inc.

Before KNOCH, Circuit Judge, and PERRY and MINER, District Judges.

PERRY, District Judge.

Plaintiff, Midwest Emery Freight System, Inc., seeks to vacate, enjoin, annul and set aside two orders, dated September 6, 1960 and February 1, 1961, respectively, of the Interstate Commerce Commission in Investigation and Suspension Docket No. M–12193 Twine and Crude Rubber—The Emery Transportation Company.[1]

The action is brought pursuant to provisions of 28 U.S.C.A. §§ 1336, 1398, 2284, 2321, 2323, 2324, and 2325, and 5 U.S.C.A. § 1009. The United States of America is named as a defendant pursuant to 28 U.S.C.A. § 2322.

Plaintiff (a corporation organized under the laws of the State of Ohio and having its principal place of business in Chicago, Illinois) is a common carrier by motor vehicle of various commodities in interstate and foreign commerce pursuant to operating authority granted by the Interstate Commerce Commission. That operating authority, however, did not authorize plaintiff to transport crude rubber.

Common carriers by motor vehicle engaged in any interstate or foreign operation are required to have a certificate of public convenience and necessity issued by the Interstate Commerce Commission authorizing such operations. (49 U.S.C.A. §§ 306, 307) The Interstate Commerce Act provides, however, for certain exemptions, one of which is the agricultural exemption provision involved in the instant case and found in Section 203(b)(6) of the Act. (49 U.S.C.A. § 303(b)(6).)

Before it was amended by Congress in 1958, Section 203(b)(6) read as follows:

"(b) Nothing in this part, except the provisions of Section 204 of this title relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment shall be construed to include * * *.

"(6) motor vehicles used in carrying property consisting of ordinary livestock, * * *, or agricultural (including horticultural) commodities (not including manufactured products thereof), if such motor vehicles are not used in carrying any other property, or passengers, for compensation; * * *."

Effective August 12, 1958, Section 203 (b) (6) was amended by the passage of Section 7 of the Transportation Act of 1958 (Public Law 85–625, 72 Stat. 573) which provides:

"Sec. 7. (a) Clause (6) of subsection (b) of section 203 of the Interstate Commerce Act, as amended, is amended by striking out the semicolon at the end thereof and inserting in lieu thereof a colon and the following: *'Provided,* That the words "property consisting of ordinary livestock, fish (including shell fish), or agricultural (including horticultural), commodities (not including manufactured products thereof)" as used herein shall include property shown as "Exempt" in the "Commodity List" incorporated in ruling numbered 107, March 19, 1958, Bureau of Motor Carriers, Interstate Commerce Commission, but shall not include property shown therein as "Not exempt": *Provided further, however,* That notwithstanding the preceding proviso the words "property consisting of ordinary livestock, fish (including shell fish), or agricultural (including horticultural) commodities (not including manufactured products thereof)" shall not be deemed to include frozen fruits, frozen berries, frozen vegetables, cocoa beans, coffee beans,

---

1. Former corporate name of plaintiff herein.

tea, bananas, or hemp, and wool imported from any foreign country, wool tops and noils, or wool waste (carded, spun, woven, or knitted), and shall be deemed to include cooked or uncooked (including breaded) fish or shell fish when frozen or fresh (but not including fish and shell fish which have been treated for preserving, such as canned, smoked, pickled, spiced, corned or kippered products) ;'

"(b) Unless otherwise specifically indicated therein, the holder of any certificate or permit heretofore issued by the Interstate Commerce Commission, or hereafter so issued pursuant to an application filed on or before the date on which this section takes effect, authorizing the holder thereof to engage as a common or contract carrier by motor vehicle in the transportation in interstate or foreign commerce of property made subject to the provisions of part II of the Interstate Commerce Act by paragraph (a) of this section, over any route or routes or within any territory, may without making application under that Act engage, to the same extent and subject to the same terms, conditions and limitations, as a common or contract carrier by motor vehicle, as the case may be, in the transportation of such property, over such route or routes or within such territory, in interstate or foreign commerce.

"(c) Subject to the provisions of section 210 of the Interstate Commerce Act, if any person (or its predecessor in interest) was in bona fide operation on May 1, 1958, over any route or routes or within any territory, in the transportation of property for compensation by motor vehicle made subject to the provisions of part II of that Act by paragraph (a) of this section, in interstate or foreign commerce, and has so operated since that time (or if engaged in furnishing seasonal serv-ice only, was in bona fide operation on May 1, 1958, during the season ordinarily covered by its operations and has so operated since that time), except in either instance as to interruptions of service over which such applicant or its predecessor in interest had no control, the Interstate Commerce Commission shall without further proceedings issue a certificate or permit, as the type of operation may warrant, authorizing such operations as a common or contract carrier by motor vehicle if application is made to the said Commission as provided in part II of the Interstate Commerce Act and within one hundred and twenty days after the date on which this section takes effect. Pending the determination of any such application, the continuance of such operation without a certificate or permit shall be lawful. Any carrier which on the date this section takes effect is engaged in an operation of the character specified in the foregoing provisions of this paragraph, but was not engaged in such operation on May 1, 1958, may under such regulations as the Interstate Commerce Commission shall prescribe, if application for a certificate or permit is made to the said Commission within one hundred and twenty days after the date on which this section takes effect, continue such operation without a certificate or permit pending the determination of such application in accordance with the provisions of part II of the Interstate Commerce Act."

Under above quoted Section 7(c) of the Transportation Act of 1958, plaintiff filed with the Interstate Commerce Commission on December 10, 1958, an application for a motor-carrier "grandfather" certificate and an application for an "interim" certificate authorizing the transportation, among other commodities, of crude rubber.

Plaintiff also filed tariff schedules (to become effective February 5, 1959) by

which it proposed to establish initial truckload rates on certain commodities, including crude rubber. These rates were filed in connection with its aforesaid applications for motor carrier "grandfather" certificate and application for an "interim" certificate, plaintiff's operating authority not including the transportation of crude rubber.

It appears that on the protests of certain railroads and several associations of motor common carriers, the operation of the schedules was suspended by the Board of Suspension to and including September 4, 1959. Thereafter plaintiff voluntarily postponed the effective date of the schedules to and including May 4, 1960.

It appears that after hearings held in Washington, D. C., before an Examiner of the Commission, and briefs filed, the Examiner's Report and Recommended Order, served May 10, 1960, recommended the cancellation of the schedules. Quoting from the concluding portion of said Report:

"* * * It is abundantly clear from the prescribed forms of the section-7 applications, the Information Bulletin, and the precedent cases herein set forth that the Commission has determined that an article not included among the 11 commodities is not within section-7 applications. Conclusions and findings beyond that point are gratuitous.

"It is not necessary, as protestants contend and as they set forth in their joint brief as requested finding No. 1, to determine whether an article was exempt prior to the enactment of section 7 if it is not included in the 11 commodities. Crude rubber is not included therein, and it is shown as not exempt in ruling No. 107. It is concluded that the rates here in issue are for transportation which Emery is without authority to perform.

"The examiner finds that the suspended tariff schedules on crude rubber are not within the scope of the operating authority granted to The Emery Transportation Company or available to it under section 7 of the Transportation Act of 1958 and are therefore unlawful. The attached order requires Emery to cancel the suspended schedules, and discontinues this proceeding."

Plaintiff filed exceptions to the Examiner's Report and Recommended Order and protestants replied. Quoting from the Report (dated September 6, 1960) of the Commission, by Division 3:

"The 'grandfather' rights provided in connection with the amendment of section 203(b) (6) apply only to those commodities which were formerly exempt, but which by the amendment are made subject to economic regulation under part II of the Act. See Citrus Fruit Juice to Central and Midwest Territories, 308 I.C.C. 552, Various Commodities Between Points and Places in U. S., supra, and Frozen Cooked Vegetables—Status, 81 M. C.C. 649. The application forms prescribed for the rights reserved in section 7(c) of the Transportation Act of 1958, and the information bulletins issued subsequent to its effective date, both referred to in the recommended report, make it clear what commodities were thereby affected. The non-exempt status of crude rubber was not changed by the amendment.

"We find that the schedules herein under investigation are unlawful because they would apply for transportation beyond the scope of the respondent's present authority and that potentially available to it under section 7 of the Transportation Act of 1958. An order will be entered requiring their cancellation and discontinuing the proceeding."

Thereafter plaintiff petitioned for reconsideration of the Report and Order of Division 3, and on February 1, 1961, an order was entered by the entire Com-

mission. That order denied plaintiff's petition for reconsideration and reinstated the order of September 6, 1960, modifying it so as to become effective on April 3, 1961.

Plaintiff filed its complaint herein on March 30, 1961, praying that the two orders, dated September 6, 1960 and February 1, 1961, respectively, be suspended, enjoined, annulled and set aside, and alleging that the Commission's Report of September 6, 1960, and the said two orders are "arbitrary, capricious, unlawful, an abuse of the Commission's discretion, are in excess of its statutory authority, and contravene the policy and purpose of the Transportation Act of 1958 for the following reasons:

"(1) That crude rubber was in fact and law an exempt commodity prior to the passage of the Transportation Act of 1958.

"(2) That Congress in amending Section 203(b) (6) of the Interstate Commerce Act by the Transportation Act of 1958 had as its sole purpose the return to economic regulation of certain commodities previously held to be exempt, and to establish the future status of such commodities as listed in Administrative Ruling No. 107, issued by the Bureau of Motor Carriers, dated March 19, 1958.

"(3) That crude rubber, in the form and manner received by Plaintiff for transportation is a commodity made subject to economic regulation for the first time, as of August 12, 1958, the effective date of the amendment; and that as such, Plaintiff was specifically given the right to continue the transportation thereof under the 'grandfather' and 'interim' provisions of Section 7(c) of said Act of 1958.

"(4) That as Section 7 is interpreted by the Commission in its orders of September 6, 1960 and February 1, 1961, retroactive application is given to Administrative Ruling No. 107, with the resultant effect that Plaintiff is deprived of its statutory right to continue the transportation of crude rubber under the 'grandfather' and 'interim' provisions of said Section 7.

"(5) That in fact and law Administrative Ruling No. 107 is purely interpretative, was without any force and effect whatsoever prior to the time it was incorporated into the Transportation Act of 1958. * * *"

Administrative Ruling 107 of the Bureau of Motor Carriers, which relates to Section 203(b) (6), lists rubber as not exempt—

"Rubber, crude, in bales—Not exempt— Bureau opinion.

"   , latex, natural, liquid, from which water has been extracted and to which ammonia has been added—Not exempt—Case 15."

Dispositive of the instant case is Milk Transport, Inc. v. Interstate Commerce Commission et al., 190 F.Supp. 350, which was affirmed by the Supreme Court of the United States on October 9, 1961. (368 U.S. 5, 82 S.Ct. 15, 7 L.Ed. 2d 16.)

In the Milk Transport case (which involved citrus juices, also listed as not exempt by Ruling 107), many of the same issues were raised and considered by the court that have been raised in the instant case. That statutory three-judge court had before it an appeal from an order of the Interstate Commerce Commission dismissing applications filed by Milk Transport, Inc., under Section 7 of the Transportation Act of 1958 for authority to transport citrus juices in bulk under the "grandfather" and "interim" clauses. As in this case, the broad issue there was whether an interstate commerce carrier in bona fide transportation of a commodity prior to the 1958 Transportation Act has an absolute right, under the "grandfather" clause of that Act, to continue transporting that commodity without obtaining a Certificate of Public Convenience and Necessity from the Commission, or whether the "grandfather" rights under

said Section 7 extend only to the transportation of the eleven commodities specified in Section 7(a) of the Act.

In a unanimous decision, the court sustained the dismissal by the Commission of Milk Transport's applications.

Quoting from the decision of the court, beginning at page 352—

"Plaintiff contends since there's no dispute that it was a bona fide hauler of citrus juices prior to 1958, the only issue for this court is whether citrus juices were 'exempt' commodities prior to the 1958 Transportation Act amendment of Section 203(b)(6). If citrus juices were exempt, plaintiff claims the Commission must under the 'grandfather' clause issue plaintiff a certificate without proof of public convenience and necessity. Plaintiff argues that even though the Commission had held citrus juices to be 'non exempt' prior to 1958 in Watkins Motor Lines, Inc., Interpretation, 64 M.C.C. 455 (Div. 1, 1955), later U. S. Supreme Court and Federal District Court cases * * * make it clear that citrus juices would have been declared 'exempt' had an appropriate controversy reached the courts.

"The defendants contend the issue of whether citrus juices were 'exempt' prior to 1958 is not relevant to this proceeding. They argue that 'grandfather' rights were conferred only on the eleven commodities specifically listed in Section 7(a) as now being 'non exempt.' Defendants argue that the wording of Section 7(c) plus the Congressional intent as evidenced by committee reports indicates that only the eleven commodities listed were 'made subject to' the certificate requirement of Part II of the Act, and consequently 'grandfather' rights were given only to carriers of those specific commodities. Since citrus juices were not included in the commodities specifically listed in Section 7(a), they submit the question

of whether citrus juices were 'exempt' prior to 1958 is irrelevant.

"We agree with the defendants that the first issue to be met is whether citrus juices were covered by the 'grandfather' clause. If citrus juices were not included, we need not determine whether they were 'exempt' prior to 1958.

"It is axiomatic that Congress could include or exclude any commodities from the benefit of the 'grandfather' clause. Congress could have refused to include any 'grandfather' benefits in the 1958 Act. Consequently, assuming that a particular commodity had been specifically held 'exempt' prior to 1958 and then declared 'non exempt' by the 1958 Act, Congress could have excluded this particular commodity from 'grandfather' rights while giving the benefit to other commodities. We must therefore look to the statute to determine whether citrus juices were accorded 'grandfather' rights.

"The essential provisions of Sections 7(c) and 7(a) have been previously quoted in this memorandum. The primary question in resolving this dispute is the determination of what the words 'made subject to' mean in the context of the statute. Plaintiff contends the phrase means that all commodities in Section 7(a), including those in Ruling 107 in the first proviso are subjected to the requirements of Part II of the Act. Defendants argue that the only items 'made subject to' Part II are the eleven specified commodities in the second proviso. No determination as to the status of several of these commodities had ever been made, but Ruling 107 listed most of the eleven items as having been found 'exempt' by the courts or the Commission, and defendants contend that these items were being brought back under regulation by Section 7(a). They argue that Congress gave 'grandfather' rights

only to carriers which had been legitimately hauling these eleven commodities.

We agree with the defendants' interpretation of Section 7(c). Congress did not have to make the items in Ruling 107 subject to the Act, with the exception of the eleven commodities which had either been declared 'exempt' or on which no ruling had been made. It is perhaps true, as plaintiff argues, that Congress would have specifically afforded 'grandfather' rights to citrus juices had they been declared 'exempt' in any appropriate controversy which reached the courts. Remembering, however, that Congress could limit 'grandfather' benefits as it chose, it matters only that Congress gave its approval to the Commission's characterization of citrus juices as 'non exempt' commodities. Citrus juices had been held 'non exempt' prior to 1958 by the Commission, Watkins Motor Lines, Inc., Interpretation, 64 M.C.C. 455 (Div. 1, 1955), and Congress was providing 'grandfather' rights only for carriers of those eleven commodities which had been 'exempt' and were being specifically made 'non exempt.'

"Where the terms of a statute are not clear, we may look to the legislative history in an attempt to determine the intent of Congress. * * "

The court quoted in part from the committee and conference reports and concluded, "It is clear from this language that Congress intended only the eleven specified commodities, and not including citrus juices, to have 'grandfather' benefits."

It is the view of this court that there was a rational basis for the Commission's decision that no prescriptive rights were conferred upon plaintiff, Midwest Emery Freight System, Inc., (under the provisions of Section 7 of the Transportation Act of 1958) because of its transportation of crude rubber prior to 1958, and for the Commission's conclusion that the schedules sought to be published on crude rubber are unlawful "because they would apply for transportation beyond the scope of the respondent's present authority and that potentially available to it under Section 7 of the Transportation Act of 1958."

The Commission's order of September 6, 1960, which discontinued the proceeding, and its order of February 1, 1961, which denied plaintiff's petition for reconsideration, were proper.

The relief prayed for by plaintiff is denied, the complaint is dismissed, and the temporary restraining order heretofore entered herein is dissolved.